# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 18-2260-GW(FFMx) | Date | August 27, 2018 |
|---|---|---|---|
| Title | *Reflex Media, Inc., et al. v. Pilgrim Studios, Inc., et al.* | | |


Present: The Honorable  GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | Katie Thibodeaux | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Mark L. Smith | Cydney Swofford Freeman |
| Joseph A. Schaeffer | Nicolas A. Jampol |

**PROCEEDINGS:    PILGRIM'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT [47]**


Court and counsel confer. The Tentative circulated and attached hereto, is adopted as the Court's Final Ruling. The Court would GRANT the Motion. It would DISMISS the trademark and unfair competition claims WITHOUT PREJUDICE, but would DISMISS the copyright claims WITH PREJUDICE because the Court has found a lack of substantial similarity as to protected elements by reviewing the precise works at issue. If Plaintiffs wish to proceed with the trademark infringement and unfair competition claims, they should file the second amended complaint by September 28, 2018.

The Court sets a status conference for October 18, 2018 at 8:30 a.m.

| | : | 03 |
|---|---|---|
| Initials of Preparer | JG | |

*Reflex Media, Inc. v. Pilgrim Studios, Inc.*, Case No. 18-cv-2260-GW-(FFMx)
Tentative Ruling on Motion to Dismiss Plaintiffs' First Amended Complaint

## I. Backround

### A. Factual Background

Plaintiffs Reflex Media, Inc. ("Reflex") and Clover8 Investments PTE. LTD. ("Clover8" and collectively with Reflex, "Plaintiffs") sue Pilgrim Media Group, LLC ("Pilgrim Media"), Pilgrim Films and Television, LLC ("Pilgrim Films"), Pilgrim Operations, LLC ("Pilgrim Operations" and collectively with Pilgrim Media and Pilgrim Films, "PMG" or the "PMG Defendants"), Lifetime Entertainment Services, LLC ("Lifetime Entertainment"), A&E Television Networks, LLC ("A&E," and together with Lifetime Entertainment, "Network"), AfterBuzz TV, LLC ("AfterBuzz TV" and collectively with PMG and the Network, "Defendants"). *See generally* First Amended Complaint ("FAC"), Docket No. 37. Plaintiffs sue all defendants for: (1) California common law trademark infringement; (2) all defendants except for Pilgrim Operations and AfterBuzz TV for contributory trademark infringement; (3) all defendants except for Pilgrim Operations for vicarious trademark infringement; (4) all defendants for federal false designations, false descriptions, and false advertising, and unfair competition under 15 U.S.C. § 1125(a); (5) Pilgrim Films for fraud in the application under 15 U.S.C. §§ 1199 and 1120, 28 U.S.C. § 2201; (6) all defendants except AfterBuzz TV for copyright infringement under 17 U.S.C. § 501; (7) all defendants except Pilgrim Operations and AfterBuzz TV for contributory copyright infringement; (8) all defendants except Pilgrim Operations and AfterBuzz TV for vicarious copyright infringement; and (9) all defendants for unfair competition under California Business & Professions Code § 17200 *et seq. See id.* Plaintiffs seek injunctive relief, actual damages and lost profits plus any additional profits, treble damages, costs, reasonable attorneys' fees and investigative expenses, a constructive trust on all of Defendants' funds and assets arising out of Defendants' infringing activities, and various requests that the Court "adjudge" matters. *See id.* at 30-31.

The FAC alleges the following:[1]

### *1. Development & Production of Reflex Media's Original Series*

In early 2015, Reflex Media began to develop a reality entertainment series named *Love*

---

[1] Plaintiffs attach eight exhibits to the FAC. *See* Docket Nos. 37-1 to 37-8.

*at First Flight* (the "Original Series").  *See* FAC ¶ 30.  Plaintiff Clover8 has applied for a federal trademark at the behest of Plaintiff Reflex for the phrase "LOVE AT FIRST FLIGHT," the title of the Original Series and hereinafter referred to as "the Mark."  In advertising for the Original Series, it was described as a new web series by travel dating site, MissTravel.com, following two "singles" as they go on a "destination first date."  *See id.*  In other words, they travel to romantic getaways as their first date location instead of dinner and a movie.  *See id.*  The advertising begged the question: "Will these singles miss their connection, or will they find Love at First Flight?  Watch to find out!"

For casting, Reflex Media approached individuals with substantial social media audiences.  *See id.* ¶ 31.  On August 11, 2015, the first four episodes of the Original Series was uploaded to and available on YouTube to a worldwide audience.  *See id.* ¶ 32.  These videos are still featured on Reflex Media's YouTube channel DateMissTravel and are also featured on www.misstravel.com/press and www.misstravel.com/laff.  *See id.* ¶ 33.  Each episode notes in the description that it is part of the *Love at First Flight* series (using standard font).  Each episode features the Mark in the form of a "Logo" as depicted in Paragraph 36 of the FAC.  It reads "LOVE AT FIRST Flight by <u>Miss</u> TRAVEL", with some of the Logo in cursive, some in block lettering, some in black font, and some in an aqua color font.  *See id.* ¶ 36 (the image itself is located on the FAC; the Court is merely describing that image here).  The Original Series has been promoted with the Logo against a specific background, as depicted in Paragraph 37 of the FAC.

In late 2015, Reflex Media was approached by Cry Baby Media and another production company about adapting the Original Series for television.  *See id.* ¶ 38.  Cry Baby Media had partnered on production with the PMG Defendants for two reality television shows: *Down East Dickering* (which A&E also partnered with them on and aired on its television network, airing from April 2014 until January 2015) and *Ghost Brothers* (airing from April 2016 until present).  *See id.* ¶ 39.  The PMG Defendants employ/employed Mike Nichols ("Nichols") and Craig Piligian") as executive producers on those two shows, as well as on what the FAC refers to as the "Infringing Series."  *See id.* ¶ 40.

### 2. Development of the Allegedly Infringing Series

The PMG Defendants began to develop the Infringing Series in or around 2016, after Cry Baby Media had approached Reflex Media and months after the Original Series was published

2

on YouTube. *See id.* ¶ 41. In either late 2016 or early 2017, PMG Defendants began to cast participants for the Infringing Series, posting a casting call on their website on January 3, 2017, titled "Take A Trip and Meet the Love Of Your Life On FYI Network's TV Show Love at First Flight." *See id.* ¶ 42.

On February 6, 2017, representatives from Reflex Media and the PMG Defendants discussed the allegedly Infringing Series on a phone call. One day after that phone call, a Reflex Media representative sent an email to the PMG Defendants, reading in part:

> We talked yesterday on the phone regarding [your] interest in Love at First Flight. [I]'d like to set up a meeting with the project lead, yourself, and any producers on the show to discuss us potentially working together for branding and marketing of the show. We produced a show nearly identical in concept (https://www.misstravel.com/laff), and we think we could offer insight and branding to your show! Please feel free to email or call.

*See id.* ¶ 44. There were then a few communications back and forth, with a Reflex Media representative asking the PMG Defendants to at least change the name of the show out of a fear of likelihood of confusion with the Original Series and stating they had a common law trademark over the title *Love at First Flight. See id.* ¶ 46. There was no response to the request for changing the title of the allegedly Infringing Series. *See id.* ¶ 48.

### 3. Pilgrim Films Files a Trademark Application

Six days after Reflex Media informed the PMG Defendants about the common law trademark, Defendants, through Pilgrim Films, filed a trademark application for "LOVE AT FIRST FLIGHT" with the USPTO, which became Application Serial No. 87351899 (the "Trademark Application"). *See id.* ¶ 50. Pilgrim Films likely filed that trademark in response to being told that PMG Defendants were not authorized to use the mark. *See id.* ¶ 57. This was an "intent-to-use" application. *See id.* ¶ 50-52. The Trademark Application is for "[e]ntertainment services in the nature of a television and multimedia program series featuring subjects of general human interest distributed via various platforms across multiple forms of transmission media; providing entertainment information to others via a global computer network." *See id.* ¶ 53. Pilgrim Films made various declarations as part of the application, such as that it believed it was entitled to use the mark in commerce and that it did not think anyone else had the right to use the mark in commerce. *See id.* ¶¶ 54-55. As of the date of filing, Pilgrim Films has yet to file a statement of use with the USPTO. *See id.* ¶ 61.

### 4. Prior to the Broadcast of the Allegedly Infringing Series, Plaintiffs Provide Further Notice

3

On or around March 24, 2017, Reflex Media delivered a cease and desist letter to Pilgrim Films, requesting they revoke the Trademark Application and stop infringing on Reflex Media's mark. *See id.* ¶ 62. Defendants did not respond, and instead they moved forward with producing the allegedly Infringing Series, filming the series between October 8, 2017 and November 5, 2017. *See id.* ¶¶ 63-64. On January 25, 2018, Defendants announced they would broadcast the first episode of the allegedly Infringing Series on March 20, 2018 on Lifetime, owned by A&E, and they ended up doing so on that date. *See id.* ¶¶ 65-66. Since that time, Defendants have aired eight total episodes, comprising of the first season of the Infringing Series. *See id.* ¶ 67. After the debut of the allegedly Infringing Series, AfterBuzz TV published a 52 minute video titled, "Love at First Flight Season 1 Episode 1 Review & Reaction," where the hosts discussed the Infringing Series' first episode. *See id.* ¶ 68. AfterBuzz TV did this five more times (collectively as a series, the "After Show"), broadcasting each and with four episodes featuring a participant from the Infringing Series as a guest. *See id.* To promote the Infringing Series and After Show, Defendants used Reflex Media's Logo as its thumbnail image link to the After Show's live stream and video. *See id.* ¶ 69, Exs. 2-3.

### 5. Other Allegations Relating to Trademark Infringement

Reflex Media spent substantial time and resources in creating the Original Series, including casting and compensating social media personalities to appear in and promote the series, flying cast and film crews to destinations for filming, arranging and paying for activities, editing the film, and creating artwork for the show. *See id.* ¶ 70. The Original Series received media coverage and was featured in articles, including articles on *DatingAdvice.com and Metro*. *See id.* ¶ 71. The Original Series has been viewed more than 701,000 times. *See id.* Defendants did not use the Mark in commerce until after Reflex Media did so in connection with the Original Series. *See id.* ¶ 72. Defendants advertised the allegedly Infringing Series using marks confusingly similar to the Mark on the Internet, including on the PMG Defendants' website, on the Lifetime network's website, Facebook.com, YouTube, and on search engines like Google, Yahoo!, DuckDuckGo, and Ask.com, where the allegedly Infringing Series' search results are intermingled with the search results from the Original Series. *See id.* ¶ 76. The After Show also promoted the allegedly Infringing Series. *See id.* ¶ 80.

### 6. Other Allegations Relating to Copyright Infringement

Defendants had access to Reflex Media's Original Series, available to the public on

YouTube before Defendants began producing the allegedly Infringing Series. *See* FAC ¶ 82. The PMG Defendants copied, without authorization, the core plot, theme, mood, settings, and characters of the Original Series. *See id.* ¶ 83. The Original Series consists of individuals meeting for the first time in-person at "exotic" locations like Hawaii, Mexico, Canada, and Costa Rica, with the Infringing Series similarly consisting of dates in "exotic" locations like Hawaii, Las Vegas, Seattle, and New York City. *See id.* ¶¶ 84, 86. Both shows feature "young attractive singles" participating in bonding activities like boating, paddle water activities, ocean snorkeling, and live performances of shirtless male dancers. *See id.* The theme and mood of each show conveys fun, adventure, and anticipation for the prospect of burgeoning "romantic feelings" between participants. *See id.* ¶¶ 85, 87.

### B. Procedural Background

Pending before the Court is the motion to dismiss. *See* Pilgrim's Notice of Motion and Motion to Dismiss Plaintiffs' First Amended Complaint ("Motion"), Docket No. 47. All current defendants except for AfterBuzz ("Moving Defendants") join in the Motion.[2] *See generally id.* Moving Defendants filed a request for judicial notice.[3] *See* Pilgrim's Request for Judicial Notice

---

[2] Plaintiffs filed a Notice of Dismissal Pursuant to Federal Rules of Civil Procedure 41(a) or (c), Docket No. 53, as to Lifetime Entertainment. Therefore, it seems that Lifetime Entertainment is also not part of the Motion.

[3] It does not appear that Plaintiffs opposed Moving Defendants' RJN. *See generally* Opp'n. Moving Defendants provided copies of the Original Series and the Allegedly Infringing Series as part of their RJN. *See* Defs.' RJN at 1 (discussing Exhibits A through H, which are the 8 episodes of the Allegedly Infringing Series and Exhibits I through L, which are the episodes of the Original Series); Notice of Lodging of Exhibits A-L (Two DVDs), Docket No. 49. There is no dispute as to the authenticity of these materials, and because the contents of these materials is alleged in the FAC, *see generally* FAC, the Court would consider these materials in considering the Motion. Indeed, the Court may consider the content of these materials as documentary facts alleged in the FAC. *See Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1126-28 (C.D. Cal. 2007) (where plaintiff alleged that defendants' television show infringed its copyrighted treatment and script for a television show, court could consider copies of television show provided by defendants and could "consider the content of the show as a [sic] documentary facts whose contents are alleged in the complaint").

Moving Defendants also request that the Court take judicial notice of "generic elements common to reality dating shows," which they proffer including: (1) casting young attractive singles, (2) filming multiple-day dates in exotic locations, (3) contestants participating in bonding activities, and (4) a theme and mood of fun, adventure, and anticipation for the prospect of burgeoning romantic feelings between the participants on the show. *See* Defs.' RJN at 1-6. "Courts 'may [also] take judicial notice of generic elements of creative works' and elements common to a genre." *Fillmore v. Blumhouse Prods., LLC*, No. 2:16-CV-04348-AB-(SSx), 2017 WL 4708018, at *2 (C.D. Cal. July 7, 2017) (quoting *Zella*, 529 F. Supp. 2d at 1129). Considering that Plaintiffs have not meaningfully opposed the Court taking judicial notice of the generic elements proffered in Moving Defendants' RJN, and because those elements are not subject to reasonable dispute and are generally known within the Court's jurisdiction, the Court takes judicial notice of those generic elements. *See Fillmore*, 2017 WL 4708018, at *2 ("The Court has considered the proffered facts and literary elements and finds that they are not subject to reasonable dispute because they are generally known within the court's jurisdiction. *See* Fed. R. Civ. P. 201(b)(1). The Court therefore takes judicial notice of the listed facts and literary elements.").

("Defs.' RJN"), Docket No. 48.  Plaintiffs filed an opposition.  *See* Plaintiffs' Memorandum in Opposition to Pilgrim Defendants' Motion to Dismiss First Amended Complaint ("Opp'n"), Docket No. 54.  Plaintiffs make their own request for judicial notice.  *See* Request for Judicial Notice in Support of Plaintiffs' Opposition ("Pls.' RJN"), Docket No. 55.[4]  Moving Defendants filed a reply in support of the Motion.  *See* Reply in Support of Pilgrim's Motion ("Reply"), Docket No. 57.

## II. <u>Legal Standard</u>

Typically, plaintiffs in federal court need only give "a short and plain statement of the claim showing [entitlement] to relief." Fed. R. Civ. P. 8(a)(2).  Under Rule 12(b)(6), a defendant may move to dismiss for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  A complaint may be dismissed for failure to state a claim for one of two reasons: (1) lack of a cognizable legal theory; or (2) insufficient facts under a cognizable legal theory.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008) ("Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.").

In deciding a 12(b)(6) motion, a court "may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007); *see also Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (indicating that a court may consider a document "on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion").  The court must construe the complaint in the light most favorable to the plaintiff, accept all allegations of material fact as true, and draw all reasonable inferences from well-pleaded factual allegations.  *Gompper v. VISX, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001), *amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001); *Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996).  The court is not required to accept as true legal conclusions couched as factual allegations.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Where a plaintiff facing a 12(b)(6)

---

[4] The Court takes judicial notice of the screenshots of various websites that Plaintiffs submit as part of their RJN as suitable for judicial notice.  *See* Pls.' RJN at 2-4.

motion has pled "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," the motion should be denied.  *Id.*; *Sylvia Landfield Trust v. City of Los Angeles*, 729 F.3d 1189, 1191 (9th Cir. 2013).  But if "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not show[n] . . . the pleader is entitled to relief."  *Iqbal*, 556 U.S. at 679 (citations omitted).

## III. <u>Discussion</u>

Though the FAC alleges nine causes of action against various defendants, the parties both lump those causes of action into two categories in their briefing.  *See generally* Motion; Opp'n; FAC.  The first consists of the trademark claims, including unfair competition based in trademark violations; and the second consists of the copyright claims.  *See id.*

### A. Trademark and Unfair Competition Claims

The parties agree that the Court should apply the *Rogers* test to determine whether the First Amendment bars Plaintiffs' trademark and unfair competition claims.  *See* Motion at 5-7; Opp'n at 4 ("Plaintiffs and Pilgrim agree that Plaintiffs' trademark-infringement and unfair competition claims (Counts 1-5, and 9) are governed by the Lanham Act and by the Second Circuit Court of Appeals Decision, *Rogers v. Grimaldi*, 875 F.2d 994 (2nd Cir. 1998).").  *See generally Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1239-42 (9th Cir. 2013).

Though, in general, a "likelihood-of-confusion test" governs infringement claims brought under the Lanham Act, with expressive works the Ninth Circuit "ha[s] adopted the Second Circuit's *Rogers* test to strike an appropriate balance between First Amendment interests in protecting artistic expression and the Lanham Act's purposes to secure trademark rights." *Gordon v. Drape Creative, Inc.*, 897 F.3d 1184 (9th Cir. July 30, 2018) (citation omitted).  The defendant must "make a threshold legal showing that its allegedly infringing use is part of an expressive work protected by the First Amendment.  If the defendant successfully makes that threshold showing, then the plaintiff claiming trademark infringement bears a heightened burden − the plaintiff must satisfy not only the likelihood-of-confusion test but also at least one of *Rogers*'s two prongs."  *Id.*

Pursuant to the *Rogers* test, the title of an expressive work does not violate the Lanham Act "unless the title [1] has no artistic relevance to the underlying work whatsoever, [2] or, if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of

the work." *Mattel Inc. v. MCA Records, Inc.*, 296 F.3d 894, 902 (9th Cir. 2002) (internal quotation marks omitted) (quoting *Rogers*, 875 F.2d at 999). This two-prong test "insulates from restriction titles with at least minimal artistic relevance that are ambiguous or only implicitly misleading but leaves vulnerable to claims of deception titles that are explicitly misleading as to source or content, or that have no artistic relevance at all." *Rogers*, 875 F.2d at 1000. To sum up the above, "when the defendant demonstrates that First Amendment interests are at stake, the plaintiff claiming infringement must show not only (1) that it has a valid, protectable trademark, and (2) that the defendant's use of the mark is likely to cause confusion, but also (3) that the mark is either not artistically relevant to the underlying work *or* explicitly misleads consumers as to the source or content of the work." *Gordon*, 2018 WL 3613961, at * 4.

As to the applicability of the *Rogers* test to the works at issue, the Ninth Circuit has recently held the following:

> [The plaintiff] also claims that [the defendant's] uses of the "Empire" mark fall within the Lanham Act due to a footnote in *Rogers*, which stated that *Rogers*' "limiting construction would not apply to misleading titles that are confusingly similar to other titles [because the] public interest in sparing consumers this type of confusion outweighs the slight public interest in permitting authors to use such titles." 875 F.2d at 999 n.5. This footnote has been cited only once by an appellate court since *Rogers*, in a case in which the Second Circuit itself rejected its applicability and applied the *Rogers* test. *See Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Grp., Inc.*, 886 F.2d 490, 494-95 (2d Cir. 1989). The exception the footnote suggests may be ill-advised or unnecessary: identifying "misleading titles that are confusingly similar to other titles" has the potential to duplicate either the likelihood-of-confusion test or the second prong of *Rogers*, which asks whether a title "explicitly misleads as to the source or the content of the work." *Mattel*, 296 F.3d at 902 (quoting *Rogers*, 875 F.2d at 999). More importantly, it conflicts with our precedents, which "dictate that we apply the *Rogers* test in [Lanham Act] § 43(a) cases involving expressive works." *Brown*, 724 F.3d at 1241-42. We therefore examine [the defendant's] use of the "Empire" mark under that test [despite the presence of confusingly similar titles].

*See Twentieth Century Fox Television a division of Twentieth Century Fox Film Corp. v. Empire Distribution, Inc.*, 875 F.3d 1192, 1197 (9th Cir. 2017). Because of this, the Court will apply that test below despite the fact that there are confusingly similar titles at play.

### 1. First Prong of the <u>Rogers</u> Test

Under the first prong of the *Rogers* test, "only the use of a trademark with 'no artistic relevance to the underlying work whatsoever' does not merit First Amendment protection. In other words, the level of relevance merely must be above zero." *E.S.S. Entm't 2000, Inc. v. Rock*

*Star Videos, Inc.*, 547 F.3d 1095, 1100 (9th Cir. 2008).  "A mark that has no meaning beyond its source-identifying function is more likely to be used in a way that has 'no artistic relevance to the underlying work whatsoever,' [citation] because the work may be 'merely borrow[ing] another's property to get attention,' [citation]." *Id.* at 1198 (quoting *Mattel*, 296 F.3d at 901-02; and citing *Dr. Seuss Ents., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1401 (9th Cir. 1997)).

Plaintiffs do not meaningfully argue that the allegedly Infringing Series' title (which is also the Mark) *Love at First Flight* has *zero* artistic significance to the underlying work.  The FAC describes the allegedly Infringing Series as the following:

> Defendants' Allegedly Infringing Series similarly consists of multiple-day dates in exotic locations such as Hawaii, Las Vegas, Seattle, and New York City. The participants featured in the Allegedly Infringing Series also are young attractive singles who participate in bonding activities such as: attending a live performance featuring shirtless male dancers, tree climbing using climbing lines, waterfall activities, boating, paddle water activities, and ocean snorkeling.

*See* FAC ¶ 86.  Based on a comparison of this allegation with the title *Love at First Flight*, the Court would conclude that the artistic relevance of the title to the allegedly Infringing Series is certainly above zero.  *See CI Games S.A. v. Destination Films*, No. 2:16-CV-05719-SVW-JC, 2016 WL 9185391, at *7 (C.D. Cal. Oct. 25, 2016) ("The Court now finds that the Defendants have satisfied this very low bar.  The Defendants could only fail this prong if the title had zero relevance to the movie, which is not the case here.") (footnotes omitted).  The Court would also reach that conclusion after reviewing the copies of the allegedly Infringing Series.  *See* Defs.' RJN Exs. A-H.

### 2. Second Prong of the <u>Rogers</u> Test

The *Rogers* test's second prong requires junior users to demonstrate that their work does not explicitly mislead as to that work's content or source.  *Mattell*, 296 F.3d at 902.  "It is well established that the use of a mark alone is not enough [for the plaintiff] to satisfy this prong of the *Rogers* test."  *Brown*, 724 F.3d at 1245.  As such, the question is "whether there was an 'explicit indication,' 'overt claim,' or 'explicit misstatement' that caused . . . consumer confusion."  *Id.* (quoting *Rogers*, 875 F.2d at 1001).  According to the Ninth Circuit, even if a party produces survey evidence demonstrating consumers believed that the trademark owner endorsed the allegedly infringing work, that would not be sufficient to support a claim of explicit

misleading. *Id.* at 1245-46. "To be relevant, evidence must relate to the nature of the behavior of the identifying material's user, not the impact of the use." *Id.* at 1246. As an example, if a party produced evidence of "statements made in materials" accompanying the allegedly infringing work that explicitly misleads consumers, that might be sufficient. *Id.*

Moving Defendants argues that the Original Series' title does not expressly mislead the public about the source or content of the work. *See* Motion at 8-12. Plaintiffs seem to argue that this prong is satisfied through at least one of three avenues: (1) that the Original Series and allegedly Infringing Series bear the same name, (2) YouTube search results for the Original Series and allegedly Infringing Series, and (3) AfterBuzz's promotion of the allegedly Infringing Series using the Logo. *See* Opp'n at 5.

This prong of the *Rogers* test poses more factual considerations than the first prong. Other courts have held that summary judgment is the more proper venue for making this determination. *See CI Games S.A. v. Destination Films*, No. 2:16-CV-05719-SVW-JC, 2016 WL 9185391, at *10 (C.D. Cal. Oct. 25, 2016) (denying motion to dismiss in the context of confusingly similar titles and concluding that "[t]he Court does not hold that the Defendants are definitively not entitled to First Amendment protection under the *Rogers* test. Instead, the Court finds that the analysis of whether the First Amendment protects the actions of the Defendants is better conducted at the summary judgment stage."). Nonetheless, at this point the FAC makes no allegations that the allegedly Infringing Series *explicitly* misleads consumers as to the content or source of the work. As the Ninth Circuit has held, "[w]e must ask not only about the likelihood of consumer confusion but also 'whether there was an explicit indication, overt claim, or explicit misstatement that caused such consumer confusion . . . . the use of a mark alone is not enough to satisfy this prong of the *Rogers* test . . . ." *See* Empire, 875 F.3d at 1199. The Court simply does not see more than conclusory allegations in the FAC alleging as much, and Plaintiffs' reference to what essentially amounts to mere use is not enough to satisfy this prong.[5] Because there is no

---

[5] Even if Moving Defendants were somehow responsible for AfterBuzz's actions (which the FAC also does not allege in a more than conclusory fashion and the Opposition does not meaningfully address how that would *legally* be the case), AfterBuzz's use of the Logo alone might still be insufficient for this prong as to the Moving Defendants. The screenshots submitted as part of Plaintiffs' RJN do not change this conclusion and the FAC merely alleges in conclusory fashion that AfterBuzz "partnered with Defendants A&E, Pilgrim Media, [] and/or Pilgrim films to produce an after show that talks about and promotes the [Allegedly] Infringing Series," *see* FAC ¶ 18. Nonetheless, if Plaintiffs more adequately plead a relationship between AfterBuzz and the other defendants in an amended complaint, and explain how the other defendants are *legally* responsible for AfterBuzz's actions, the Court might revisit the issue and might consider it more suitable for summary judgment.

dispute that the allegedly Infringing Series is an expressive work, the Court would hold that the FAC does not adequately plead either prong of the *Rogers* test and it would therefore dismiss the trademark and unfair competition claims (which are rooted in trademark infringement).

### B. Copyright Claims

Moving Defendants move to dismiss the copyright claims in the FAC on the ground that the allegedly Infringing Series is not substantially similar to the Original Series.  *See* Motion at 12-24.  They request that the Court compare the works and make this determination as a matter of law.  *See id.*  Moving Defendants assert that the Court must filter out non-protectable expression, and that if it does so, it would conclude that the remaining expression in the allegedly Infringing Series is not substantially similar to the Original Series.  *See id.*

In response, Plaintiffs include a short 1.5 page section about the copyright claims.  *See* Opp'n at 14-16.  Plaintiffs' arguments almost solely rest on their assertion that Ninth Circuit precedent does not allow for dismissal of a copyright claim based on the allegations here.  *See id.* In arguing that the Original Series and allegedly Infringing Series are substantially similar, Plaintiffs' Opposition merely cites to two paragraphs in the FAC.  The first of those two paragraphs, Paragraph 84, alleges as follows as to the Original Series:

> Reflex Media's Original Series consists of individuals meeting for the first time in-person on multiple-day dates in exotic locations such as Hawaii; Cabo San Lucas, Mexico; Vancouver, Canada; and Costa Rica, and other planned locations to include landlocked cities like Las Vegas. The participants featured in the show are young attractive singles who participate in bonding activities such as: attending a live performance featuring shirtless male dancers, zip lining amongst trees, dinner dates, waterfall activities, boating, paddle water activities, and ocean snorkeling.

*See* FAC ¶ 84.  The second of those two paragraphs, Paragraph 86, alleges the following as to the allegedly Infringing Series:

> Defendants' Allegedly Infringing Series similarly consists of multiple-day dates in exotic locations such as Hawaii, Las Vegas, Seattle, and New York City.  The participants featured in the Allegedly Infringing Series also are young attractive singles who participate in bonding activities such as: attending a live performance featuring shirtless male dancers, tree climbing using climbing lines, waterfall activities, boating, paddle water activities, and ocean snorkeling.

*See id.* ¶ 86.  Also alleged in the FAC, but not cited in the Opposition, is that both sets of series convey a "theme and mood of fun, adventure, and anticipation for the prospect of burgeoning romantic feelings between the participants on the show."  *See id.* ¶¶ 85, 87.  Another relevant

11

paragraph in the FAC is Paragraph 138, alleging in a conclusory fashion as follows:

> As also described above, Defendants' Allegedly Infringing Series is substantially similar to Reflex Media's Original Series and copied the core plot, theme, mood, settings, and characters of the Original Series, including an attempt to use one of Reflex Media's previously used cast members.

*See id.* ¶ 138.

To demonstrate copyright infringement, a plaintiff must show "(1) ownership of a valid copyright, and (2) copying of constituent elements of that work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Servs. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). Copying may be established by demonstrating (1) "that the [defendant] had access to plaintiff's copyrighted work," and (2) "that the works at issue are substantially similar in their protected elements." *Cavalier v. Random House, Inc.,* 297 F.3d 815, 822 (9th Cir. 2002).[6]

Under Ninth Circuit precedent, courts employ a two-part test to determine if works are substantially similar: an intrinsic test and an extrinsic test. *Id.* "The intrinsic test is a subjective comparison that focuses on 'whether the ordinary, reasonable audience' would find the works substantially similar in the 'total concept and feel of the works.' " *Id.* (citing *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir.1994)). Because the intrinsic test is a "subjective assessment of the concept and feel of two works," *Shaw v. Lindheim*, 919 F.2d 1353, 1360 (9th Cir. 1990), a determination of two works' intrinsic similarities "must be left to the jury," *Smith v. Jackson*, 84 F.3d 1213, 1218 (9th Cir.1996).

A court may dismiss a complaint on a 12(b)(6) motion, however, for failing to satisfy the extrinsic test. *See Schkeiban v. Cameron*, No. CV 12-0636-R-(MANx), 2012 WL 5636281 (C.D. Cal. Oct. 4, 2012), *aff'd*, 566 F. App'x 616 (9th Cir. 2014) (dismissing a complaint with prejudice because the plaintiff could not satisfy the extrinsic test). The extrinsic test is an objective comparison of specific expressive elements which seeks to find "articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events in two works." *Cavalier*, 297 F.3d at 822 (citing *Kouf*, 16 F.3d at 1045). In applying the extrinsic test, courts compare "not the basic plot ideas for stories, but the actual concrete elements that make up the total sequence of events and the relationships between the major characters." *Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1077 (9th Cir. 2006) (citing *Berkic*

---

[6] For purposes of the Motion, Moving Defendants do not challenge Plaintiffs' allegation that Moving Defendants had access to the Original Series. *See* Motion at 13 n.15. Instead, Moving Defendants merely argue that the Original Series is not substantially similar to the allegedly Infringing Series in regards to their protected elements.

*v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985)). Courts must "filter out and disregard [ ] non-protectible elements" of a plaintiff's work and inquire only into "whether the *protectible elements, standing alone*, are substantially similar." *Cavalier*, 297 F.3d at 822 (quotations omitted) (emphasis in original).

"[T]he Court must apply the objective 'extrinsic test' and determine whether there are 'articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events.' " *Zella*, 529 F. Supp. 2d at 1135 (citing *Funky* Films, 462 F.3d at 1077). Because copyright law "protects expression of ideas, not the ideas themselves," stock scenes and themes "are not protected against copying." *Cavalier*, 297 F.3d at 823 (citing *Berkic*, 761 F.2d at 1293-94). Additionally, "[s]cenes-a-faire, or situations and incidents that flow necessarily or naturally from a basic plot premise, cannot sustain a finding of infringement." *Id.* In sum, courts filter out "(1) scenes a faire that necessarily result from the choice of a setting or situation; (2) purely utilitarian elements; and (3) elements of expression merged with the underlying idea." *Mattel, Inc. v. MGA Entm't*, Inc., 782 F. Supp. 2d 911, 949 (C.D. Cal. 2011). Courts focus on a comparison of "actual concrete elements that make up the total" work. *Funky Films*, 462 F.3d at 1077. Elements that are "similar at the abstract level" but are "markedly different" in their particulars are not substantially similar. *Id.* at 1078. In applying the "extrinsic test," the court can take judicial notice of the episodes of both the Original and the allegedly Infringing Series. *See Silas v. Home Box Office, Inc.*, 713 Fed.Appx. 626, 627 (9th Cir. 2018).

"[A] plaintiff who cannot satisfy the extrinsic test necessarily loses . . . because a jury may not find substantial similarity without evidence on both the extrinsic and intrinsic tests." *Kouf*, 16 F.3d at 1045 (dismissing a claim on summary judgment for failing to satisfy the extrinsic test); *see also Zella*, 529 F.Supp.2d at 1139 (dismissing a complaint on a motion to dismiss for failing to satisfy the extrinsic test).

      *1. Plot*

"Plot is defined as 'the sequence of events by which the author expresses his theme or idea.'" *See Fillmore*, 2017 WL 4708018, at *6 (quoting *Zella*, 529 F. Supp. 2d at 1133). "Basic plot ideas . . . are not protected by copyright law." *Cavalier*, 297 F.3d at 824. When analyzing whether two plots are substantially similar, courts are required to look "beyond the vague, abstracted idea of a general plot" and instead focus on "the objective details of the works." *Berkic*, 761 F.2d at 1293 (citing *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984)). In

*Berkic*, the Ninth Circuit held that no reasonable jury could find that two screenplays were substantially similar because, although "at a very high level of generality" the works had similarities, including that "both deal[t] with criminal organizations that murder healthy young people, then remove and sell their vital organs to wealthy people in need of organ transplants" and derived "their general story from the adventures of a young professional who courageously investigates, and finally exposes, the criminal organization," these ideas were only the basic plots of the two works.  *Id.*  The Ninth Circuit emphasized that the main characters and sequence of events had significant differences, the events were set in different settings, and there were different variances to the basic plot idea, including different romantic relationships between the characters.  *Id.*  Significantly, the court noted that although there were some similarities between the works, these similarities fell into categories of unprotectable expression and thus could not establish substantial similarity.  *Id.* at 1293-94.

Here, the "plots" of the Original Series and allegedly Infringing Series are fairly simple. As to the allegedly Infringing Series, which is a reality dating television series with roughly one-hour long episodes, participants are paired off with another person with whom they embark on a 30-day trip across the United States.  *See* Defs.' RJN Exs. A-H.  All eight episodes of the allegedly Infringing Series follow the same handful of pairs, with the looming and ultimate question being whether they will ultimately marry the other person.  *See id.*  They travel to various locations, and engage in bonding activities in each location with them either "winning" or "losing" various challenges.  *See id.*  The ramification of winning or losing each challenge is that they sleep in either a motel or a luxurious hotel, depending on the outcome.  *See id.* Bonding activities include country dancing, rehabilitating disabled goats, making graffiti art, and dozens of other activities.  *See id.*  At various points, the couples connect, disconnect, and everything in between.  *See id.*  The question of whether each pair will marry is constantly discussed throughout the allegedly Infringing Series, and each episode leads up to the eventual finale where the pairs physically go to the wedding altar and decide whether they will marry each other or not.[7]

The Original Series also centers on dating, and is of the reality television genre.  But, there are key differences.  Roughly 13-minute long episodes follow one pair of participants in

---

[7] The Court would take judicial notice of the number of other dating/relationship reality television series with remarkably similar elements such as *The Bachelor* and *The Bachelorette*.

each episode that meet for the first time in mostly foreign destinations. *See* Defs.' RJN Exs. I-L. Among each pair, one person is a social media "influencer" or "personality" with the other participant being a "Miss Travel [dating application] user." *See id.* The show mentions Miss Travel throughout and the pair generally stays at the same accommodations as one another, which are normally high-end vacation rentals. *See id.* Each episode usually features *one* location and *one* pair, with the parties going their separate ways at the end of the episode. *See id.* At the beginning of each episode, the narrator states, "[T]ravel is the first test of a relationship, so why not make it the first date? One website is revolutionizing the online dating game by connecting singles for dates in exotic and far-flung destinations. Watch what happens when two strangers trade dinner and a movie for a destination first date. Will this couple have a missed connection, or will they find love at first flight?" *See id.* Most of the episodes center on meals and 1-2 other activities, such as sailing or attending a luau. *See id.* In the four episodes presented to the Court, the couples get along with little to no friction. *See id.*

When the Court removes the generic elements of the two works (which admittedly are similar), there are no substantial similarities in the plot's objective details. As addressed in the Court's discussion of Moving Defendants' RJN as to the two works' generic elements, the Court removes the following generic elements in this comparison: (1) casting young attractive singles, (2) filming multiple-day dates in exotic locations, (3) contestants participating in bonding activities, and (4) a theme and mood of fun, adventure, and anticipation for the prospect of burgeoning romantic feelings between the participants on the show. The abovementioned plots of the Original Series and allegedly Infringing Series are not substantially similar once those generic elements are taken out of the equation.

### 2. Theme

A work's theme is its overarching message. *See Kouf*, 16 F.3d at 1045 (describing one work's theme as a "celebrat[ion] [of] family values" and another work's theme as "the triumph of good over evil"); *Schkeiban*, 2012 WL 5636281, at *1 (describing a work's theme as a commentary on "racism, genocide, imperialism[,] and environmentalism"). Not all works have themes. *See, e.g., Olson v. Nat'l Broad. Co.*, 855 F.2d 1446, 1451 (9th Cir. 1988) ("The two shows . . . lack identifiable themes."). When two works both lack identifiable themes, courts do not find that their common lack of a theme favors a finding of substantial similarity. *See id.* Additionally, there is no protection for stock themes or themes that flow necessarily from a basic

premise. *See id.; Cavalier*, 297 F.3d at 823.

Though theme can be a protectable element, the theme of fun, adventure, and anticipation for the prospect of burgeoning romantic feelings between participants on the show is a generic stock theme as discussed above.  In any event, the theme necessarily flows from the basic generic premise of the shows about participants dating through bonding activities while traveling.

### 3. Dialogue

In order for a plaintiff to demonstrate substantial similarity of dialogue, it must show "extended similarity of dialogue."  *See Olson*, 855 F.2d at 1450.  There is no allegation of similarity in dialogue made in the FAC, *see generally* FAC, and the Court similarly sees none upon reviewing the works at issue, *see* Defs.' RJN Exs. A-L.

### 4. Mood

"A general mood that flows 'naturally from unprotectible basic plot premises' is not entitled to protection." *Shame on You*, 120 F.Supp.3d at 1158 (quoting *Rice*, 330 F.3d at 1177); *see also Rice*, 330 F.3d at 1177 (concluding that the moods of secrecy and mystery in the magic genre are "generic [and] constitute *scenes a faire*" (italics in original)).  As discussed in the theme section above, in the Original Series, the mood of fun, adventure, and anticipation for the prospect of burgeoning romantic feelings between participants on the show flows naturally from the unprotectable basic plot premise and is thus not entitled to protection here.

### 5. Setting

Even when two shows are set in the same city, there is not necessarily a finding of substantial similarity of copyrightable expression.  *See Alexander v. Murdoch*, No. 10 CIV 5613 PAC-(JCFx), 2011 WL 2802923, at *7 (S.D.N.Y. July 14, 2011) ("[T]he choice of [a particular city] as a setting is not in itself copyrightable.").  "Setting[s] [that] naturally and necessarily flo[w] from the basic plot premise . . . constitut[e] scenes-a-faire and cannot support a finding of substantial similarity."  *See Cavalier*, 297 F.3d at 824; *see also Benay*, 607 F.3d at 627-28 (finding that settings such "the Imperial Palace, . . . the Imperial Army's training grounds, and battle[fields] [ ] in various places in Japan" were unprotected settings which flowed naturally from the premise of "an American war veteran who travels to Japan to help the Emperor fight a samurai rebellion").

In the Original Series, the episodes generally take place in large cities within the United

16

States.  On the other hand, the allegedly Infringing Series takes place predominantly in areas outside of the U.S. mainland.  The particular setting of the series are not substantially similar. Even if these shows were set in the same or similar locations, the choice of settings for each of these shows flows from their basic plot premise, therefore constituting non-protectable scenes-a-faire.  *See Cavalier*, 297 F.3d at 824.

### 6. Characters

The Ninth Circuit recently consolidated its precedent regarding which characters are copyrightable by creating a three-part test.  *See DC Comics v. Towle*, 802 F.3d 1012, 1021 (9th Cir. 2015), *cert. denied*, 136 S. Ct. 1390 (2016). Under this test, a character must: (1) have "physical as well as conceptual qualities," (2) be "sufficiently delineated," and (3) be "especially distinctive" in order to receive copyright protection.  *Id.* (finding the Batmobile to be a protected character); *see also Walt Disney Prods. v. Air Pirates*, 581 F.2d 751 (9th Cir. 1978) (finding Mickey Mouse to be a protected character); *Metro-Goldwyn–Mayer, Inc. v. Am. Honda Motor Co.*, 900 F. Supp. 1287, 1295-96 (C.D. Cal. 1995) (finding James Bond to be a protected character).

By virtue of the fact the Original Series and the allegedly Infringing Series are "reality" television series, the participants play themselves.  None of the participants overlap in the Original Series and the allegedly Infringing Series.  Though there might be similarities between some of the characters, such as their pursuit of romance or love, those are merely stock character traits and they flow from the basic premise of the series.  *Milano v. NBC Universal, Inc.*, 584 F. Supp. 2d 1288, 1296 (C.D. Cal. 2008) ("The treatment discusses what might be called stock characters or types, but nothing beyond that. For example, the treatment describes a young man who cannot be a firefighter because he is overweight, and a scorned wife who, after gaining weight, lost her husband to a younger, slimmer woman. . . . [As reality television characters,] [c]haracter is developed entirely through the dynamic interaction of the contestants over the course of the program.").  The characters in the allegedly Infringing Series and the Original Series are not substantially similar.

### 7. Pace

The timeline of a work is an important factor in determining whether pace is substantially similar.  *See, e.g., Kouf*, 16 F.3d at 1046 (finding pace to be dissimilar where one story was told in 24 hours, and the other was told over multiple days).  Pace that "flow[s] necessarily or

naturally from a basic plot premise, cannot sustain a finding of infringement."  *See Cavalier*, 297 F.3d at 823.   The pace of the Original Series and allegedly Infringing Series is markedly different: the pairs in the allegedly Infringing Series interact for an approximately 30-day period whereas the pairs in the Original Series meet for a far shorter period of time, usually a couple of days.   In any event, the pace of the Original Series and allegedly Infringing Series flows naturally from the basic plot premise.

*8. Identical Titles*

Titles are not protected by copyright law.  *See Shaw*, 919 F.2d at 1362 ("[A] title cannot be copyrighted.").   "This is true in the sense that titles, in and of themselves, cannot claim statutory copyright."  *See id.*  "Nevertheless, if the copying of a title is not an act of copyright infringement, it may . . . have copyright significance as one factor in establishing whether the substance of plaintiff's work (not the title) has been copied."  *See id.* (citation and internal quotation marks omitted).   In other words, identical titles can be circumstantial evidence that a defendant copied the plaintiff's work, and under Ninth Circuit precedent courts "acknowledge and consider defendants' admitted copying of [the original work's] title in determining whether there is substantial similarity of protected expression between the two works." *See id.*  Here, the Original Series and allegedly Infringing Series have the same title: *Love at First Flight*.   The Court will thus consider the presence of identical titles as circumstantial evidence in determining substantial similarity.

Though the two works have identical titles, in light of the lack of substantial similarity between any protectable elements of the respective works as well as the significant differences between the works, the Court would dismiss the copyright infringement claims for failing under the extrinsic test for substantial similarity.  *See Milano*, 584 F. Supp. 2d at 1297 ("In short, the treatment and 'The Biggest Loser' contain similarities but in elements that are not protectable. 'The Biggest Loser' contains important elements not found in the treatment, and the treatment includes many elements not found in the program.   Under the substantial similarity test, the copyright infringement claim fails.").  Because the Court has thoroughly reviewed the Infringing Series and Original Series in full, rather than merely relying on the FAC, the Court would dismiss the copyright claims *with* prejudice because no allegations could cure this deficiency.

## IV. <u>Conclusion</u>

The Court would **GRANT** the Motion.  It would **DISMISS** the trademark and unfair

18

competition claims **WITHOUT PREJUDICE**, but would **DISMISS** the copyright claims **WITH PREJUDICE** because the Court has found a lack of substantial similarity as to protected elements by reviewing the precise works at issue.   If Plaintiffs wish to proceed with the trademark infringement and unfair competition claims, they should file the second amended complaint within 21 days of the date the Court issues its final ruling.